NO. 18-1287
_____

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

_____

| | |
|---|---|
| ANTHONY GANT, | ) |
| | ) |
|        Appellee/plaintiff below, | ) |
| | ) |
| v. | ) |
| | ) |
| DANIEL HARTMAN, | ) |
| | ) |
|        Appellant/defendant below. | ) |

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division
Case No. 1:16-cv-380
The Honorable Chief Judge Theresa L. Springmann

## APPELLANT DANIEL HARTMAN'S BRIEF
## AND SHORT APPENDIX

**TRIER LAW OFFICE, LLC**
Carolyn M. Trier, Esq. #15581-02
P.O. Box 5528
Fort Wayne, IN 46895
Telephone: (260) 485-7000
Fax: (260) 485-7003
E-mail: carolyntrier@trierlaw.com
ATTORNEY FOR APPELLANT/DEFENDANT

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No:   18-1287

Short Caption:    *Anthony Gant v. Daniel Hartman*

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

[   ] PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Defendant-Appellant, Daniel Hartman

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Trier Law Office, LLC

(3)   If the party or amicus is a corporation:

i)   Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature:    /s/Carolyn M. Trier                                Date:    2/14/2018

Attorney's Printed Name:    Carolyn M. Trier

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d). Yes   ✓
No

Address:    Trier Law Office, LLC, P.O. Box 5528, Fort Wayne, Indiana 46895

Phone Number:   (260) 485-7000                         Fax Number:   (260) 485-7003

E-Mail Address:   CarolynTrier@trierlaw.com

rev. 01/08 AK

i

# TABLE OF CONTENTS

APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ........................... i

TABLE OF AUTHORITIES ....................................................................................... iii

JURISDICTIONAL STATEMENT ............................................................................... 1

    A. District Court's Jurisdiction ............................................................................. 1

    B. Appellate Jurisdiction ...................................................................................... 1

STATEMENT OF THE ISSUE ..................................................................................... 2

STATEMENT OF THE CASE ....................................................................................... 2

    A. Procedural History ............................................................................................ 2

    B. The District Court's Summary of the Facts ...................................................... 2

    C. Additional Undisputed Facts ............................................................................ 4

        1. Officer Daniel Hartman's Sworn Testimony ............................................. 4

        2. Officer Bradley Griffin's Sworn Testimony ............................................. 7

        3. Officer Jason Palm's Sworn Testimony ................................................... 9

        4. William J. Everett's Sworn Testimony ..................................................... 10

        5. Criminal Conviction ................................................................................. 12

SUMMARY OF THE ARGUMENT ............................................................................ 12

ARGUMENT ............................................................................................................... 13

    A. Standard of Review ......................................................................................... 13

    B. Qualified Immunity ......................................................................................... 14

    C. The Case Law Relied Upon By The District Court In Denying Qualified Immunity Did Not Put Officer Hartman On Notice That He Was Violating Clearly Established Law. ... 16

    D. Based On The United States Supreme Court And Seventh Circuit Case Law That Pre-dates August 23, 2015, Officer Hartman Did Not Violate Clearly Established Law ......... 20

CONCLUSION ............................................................................................................ 27

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7) AND CIRCUIT RULE 32(c) .......................................................................................................................... 28

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d) ........................ 29

CERTIFICATE OF SERVICE .................................................................................... 30

APPELLANT DANIEL HARTMAN'S SHORT APPENDIX ................................... 31

    INDEX TO SHORT APPENDIX .............................................................................. 32

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001)..................................................... 23, 24
*Behrens v. Pelletier*, 516 U.S. 299, 116 S. Ct. 834 (1996) ............................................... 1
*Blossom v. Yarbrough*, 492 F.3d 963 (10th Cir. 2005).................................................. 26
*Boyd v. Owen*, 481 F.3d 520 (7th Cir. 2007) ................................................................ 2
*Chandie v. Whelan*, 21 F. Supp. 2d 170, 177 (E.D.N.Y. 1988)....................................... 26
*Delgado v. Jones*, 282 F.3d 511, 514 (7th Cir. 2002).................................................... 2
*Ellis v. Wynalda*, 999 F.2d 243, 246 fn 2 (7th Cir. 1993)............................................. 13
*Estate of Tony Robinson v. the City of Madison*, 2017 WL 564682 (W.D. Wisc. 2017)........... 19
*Flynn v. Mills*, 361 F. Supp. 2d 866 (S.D. Ind. 2005)................................................... 27
*Ford v. Childers*, 855 F.2d 1271 (7th Cir. 1988)................................................... 20, 24
*Frane v. Kijowski*, 992 F. Supp. 985 (N.D. Ill. 1998).................................................. 22
*Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) ..................................................... 14
*Graham v. Connor*, 490 U.S. 386, 396-97 (1989) ................................................. 19, 20
*Green v. Carlson*, 826 F.2d 647, 651 (7th Cir. 1987)................................................. 13
*Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727 (1982) .......................................... 1
*Hosty v. Carter*, 412 F.3d 371 (7th Cir. 2005).............................................................. 1
*Jones v. City of Chicago*, 856 F.2d 935 (7th Cir. 1988) .............................................. 13
*Kisela v. Hughes*, 138 S. Ct. 1148 (2018)............................................................ 15, 17
*Lester v. City of Chicago*, 830 F.2d 706, 711 (7th Cir. 1987) ....................................... 20
*Liebenstein v. Crowe*, 826 F. Supp. 1174 (E.D. Wis. 1992)........................................... 27
*Lovett v. Herbert*, __ F.3d __, 2018 WL 5316552 (7th Cir. 2018)............................... 14
*Malley v. Briggs*, 475 U.S. 335 (1986) ....................................................................... 15
*Marshall v. Allen*, 984 F.2d 787, 791 (7th Cir. 1993).................................................. 14
*McCann v. Mangialardi*, 337 F.3d 782, 785 (7th Cir. 2003)........................................... 1
*Mitchell v. Forsyth*, 472 U.S. 511, 528-30 (1985)......................................................... 1
*Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015)............................................................. 15
*Plakas v. Drinski*, 19 F.3d 1143 (7th Cir. 1994).......................................................... 20
*Rakovich v. Wade*, 850 F.2d 1180 (7th Cir. 1988)....................................................... 13
*Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991) .................................................. 24, 25
*Saucier v. Katz*, 121 S. Ct 2151, 2156 (2001)....................................................... 14, 15
*Scott v. Edinburg*, 346 F.3d 752 (7th Cir. 2003)......................................................... 26
*Sherrod v. Berry*, 856 F.2d 802, 804-05 (7th Cir. 1988) ............................................. 26
*Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992)..................................................... 25, 26
*Sullivan v. Ramirez*, 360 F.3d 692, 696 (7th Cir. 2004) .............................................. 13
*Tennessee v. Garner*, 471 U.S. 1 (1985)............................................................... 20, 26
*Tom v. Voida*, 963 F.2d 952 (7th Cir. 1992) .............................................................. 21
*Washington v. Haupert*, 481 F.3d 543, 549 fn 2 (7th Cir. 2007)................................... 13
*White v. Gerardot*, 509 F.3d 829 (7th Cir. 2007) ....................................... 12, 16, 17, 19
*White v. Pauly*, 137 S. Ct. 548, 552 (2017) .............................................................. 16

## Statutes

28 U.S.C. § 1291............................................................................................... 1, 2
28 U.S.C. § 1331.................................................................................................. 1
28 U.S.C. § 1343.................................................................................................. 1

42 U.S.C. § 1983 ....................................................................................................... 1

**Other Authorities**

Indiana Code 35-41-3-3 ...................................................................................... 22, 26
Indiana Code 35-42-5-1 ............................................................................................. 18

## JURISDICTIONAL STATEMENT

This is an appeal from the District Court's ruling on Officer Daniel Hartman's summary judgment motion based on qualified immunity. On February 2, 2018, Chief Judge Theresa L. Springmann of the United States District Court, Northern District of Indiana, issued her Opinion and Order, denying Officer Daniel Hartman's claim of qualified immunity.

### A. District Court's Jurisdiction

The District Court has jurisdiction over this matter under 28 U.S.C. § 1331 and § 1343. Anthony Gant brought this suit under 42 U.S.C. § 1983 for an alleged Fourth Amendment violation of the United States Constitution under color of state law.

### B. Appellate Jurisdiction

This Court has jurisdiction under 28 U.S.C. § 1291 and the collateral order doctrine. On October 25, 2017, Officer Hartman moved for summary judgment based on qualified immunity as set forth in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727 (1982). On February 2, 2018, Chief Judge Theresa L. Springmann issued an Opinion and Order, denying Officer Daniel Hartman's claim of qualified immunity.

The denial of a summary judgment motion on the basis of qualified immunity is an immediately appealable collateral order. *See Behrens v. Pelletier*, 516 U.S. 299, 116 S. Ct. 834 (1996) (denial of summary judgment on grounds of qualified immunity is appealable final judgment); *Mitchell v. Forsyth*, 472 U.S. 511, 528-30 (1985) (order rejecting qualified immunity is subject to immediate appeal); *Hosty v. Carter*, 412 F.3d 371 (7th Cir. 2005) (appeal allowed when qualified immunity defense denied); *McCann v. Mangialardi*, 337 F.3d 782, 785 (7th Cir. 2003) ("Mangialardi is authorized to bring this interlocutory appeal because he is raising the question as to whether, based on the facts taken in light most favorable to McCann, he should

1

have prevailed on his defense of qualified immunity."); *Delgado v. Jones*, 282 F.3d 511, 514 (7th Cir. 2002) ("[A] denial of qualified immunity defense is an immediately appealable order under 28 U.S.C. 1291."). Under the collateral order doctrine, a denial of summary judgment on the issue of qualified immunity is immediately appealable to the extent it presents questions of law, such as whether the federal right allegedly infringed was clearly established. *Boyd v. Owen*, 481 F.3d 520 (7th Cir. 2007).

Appellant Officer Daniel Hartman filed his Notice of Appeal on February 8, 2018. This Court established a deadline of November 12, 2018, for the filing of the Appellant's brief.

## STATEMENT OF THE ISSUE

Did Officer Daniel Hartman violate clearly established law when the undisputed facts show that a reasonable officer could have concluded that the armed robbery suspect Anthony Gant presented an immediate, serious threat and that the use of deadly force was warranted?

## STATEMENT OF THE CASE

**A.** **Procedural History**

Anthony Gant initiated this action against Fort Wayne Police Officer Daniel Hartman based on Officer Hartman's use of deadly force on August 23, 2015. Anthony Gant is alleging that Officer Hartman violated his Fourth Amendment rights.

On October 25, 2017, Officer Daniel Hartman filed a summary judgment motion based on qualified immunity. On February 2, 2018, the District Court summarily dismissed all claims except the individual capacity claim against Officer Hartman. The District Court denied qualified immunity for Officer Hartman.

**B.** **The District Court's Summary of the Facts**

In its ruling on the motion for summary judgment, the District Court included the

following summary of the facts, which were construed in the light most favorable to Anthony

Gant:

"On August 23, 2015, Defendants Hartman and Griffin responded to a call regarding an armed robbery at a Dollar General store. Other police officers soon arrived at the scene, including Defendant Palm. Previously, there had been multiple armed robberies at various Dollar General stores in the City of Fort Wayne, which were carried out in similar fashion. Typically, two men would enter the store, display hand guns, confine/zip tie employees, wait for registers to open, and depart, taking cash, cigarettes, and employees' cell phones.

As Defendant Hartman approached the front door of the Dollar General on August 23, 2015, the first suspect, later identified as Christopher Johnson, ran out the front entrance. After determining that the person was a suspect and not a victim, Defendant Hartman commanded Johnson to stop and get on the ground, but Johnson ignored him and kept running. Soon after, the second suspect, later identified as Anthony Gant, exited the store through the front entrance. Defendant Hartman also commanded Gant to stop and get down on the ground. Defendant Hartman stated that he was fearful for his life because there was no cover available to him and believed that Gant was holding a handgun. Defendant Hartman discharged two rounds from his firearm, one of which struck Gant in the abdomen. It was later determined that Gant was not holding a handgun.

Defendants Griffin and Palm testified that, while observing Johnson running across the parking lot despite being commanded to stop and while concerned for their safety and the safety of others, they heard shots fired. Defendant Palm began to pursue Johnson. Defendant Griffin took the canine that was with him to the front door of the store and observed the Plaintiff in a seated position inside the vestibule. Defendant Griffin ordered the Plaintiff to get on the ground at which point the Plaintiff informed Defendant Griffin that he had been shot. Defendant Griffin called for an ambulance, handcuffed the Plaintiff, and told him to lie down.

An ambulance arrived about two minutes later. However, Defendant Griffin did not allow ambulance personnel to approach the Plaintiff until the scene had been cleared, which occurred about four minutes later. A total of six minutes elapsed between the time at which Defendant Griffin called the ambulance and the time at which emergency medical personnel were able to administer aide.

Defendant Hartman stated that when he shot the Plaintiff, he believed that the Plaintiff had a handgun in his left hand, and when the Plaintiff turned towards Defendant Hartman and began moving his hand toward the center of his body, Defendant Hartman feared for his life. Neither Defendant Griffin nor Palm saw anything in the Plaintiff's hands that appeared to be a handgun. Defendant Hartman states that the Plaintiff showed no signs of following the command to get

3

on the ground, but the Plaintiff argues that he was given no chance to obey because he was shot almost immediately after exiting the store.

The incident was captured by Defendants Hartman and Griffin's in-car cameras."

## C. Additional Undisputed Facts

### 1. Officer Daniel Hartman's Sworn Testimony

Officer Daniel Hartman became a police officer for the City of Fort Wayne on September 16, 2011. (DOC 37-1; Hartman Aff., para. 2). Officer Hartman was on duty as a Fort Wayne police officer on August 23, 2015. (*Id.*, para. 3). Officer Hartman was in full police uniform and driving a fully marked police car. (*Id.*).

On August 23, 2015, Officer Hartman responded to an armed robbery in progress at Dollar General located at 3121 East State Boulevard. (*Id.*, para. 4). Officer Hartman reviewed the Fort Wayne Police Department's radio log pertaining to this call. (*Id.*, para. 5). According to the radio log, Officer Hartman was enroute to the Dollar General at 20:17:28 and arrived on scene at 20:18:33. (*Id.*). According to the radio log, Officer Bradley Griffin arrived on scene at 20:18:38. (*Id.*).

Dispatch advised that a female caller had been on the phone with her friend, an employee of Dollar General, when the employee started screaming that she could not get into the register and that it was on a timer. (*Id.*, para. 6).

From the information distributed through Fort Wayne Police Department Comstat e-mails, Officer Hartman was aware of multiple armed robberies that had occurred specifically at Dollar General stores throughout the City of Fort Wayne. (*Id.*, para. 7). Typically, two men entered the store, displayed hand guns, confined / zip tied employees, waited for registers to open, and departed taking cash, cigarettes, and employees' cell phones. (*Id.*).

On August 23, 2015, Officer Hartman arrived in the area of the Dollar General parking

4

lot. (*Id.*, para. 8). Officer Hartman asked dispatch to "hold the air" as the armed robbery was believed to be in progress based on the information provided. (*Id.*). Officer Hartman asked dispatch to attempt to call the Dollar General employees, but this was not successful. (*Id.*, para. 9).

Other Fort Wayne police officers arrived on the scene. (*Id.*, para. 10). Officer Bradley Griffin and Officer Hartman were in front of the store to the west of the front door. (*Id.*). Officer Jason Palm was in front of the store to the east of the front door. (*Id.*). Officer Edward Black and Officer Mark Bieker were at the back of the store. (*Id.*).

Officer Hartman had requested that an additional officer make the scene as Officer Hartman was unfamiliar with the store layout and believed that a fourth officer at the front of the store would be beneficial. (*Id.*, para. 11). Sergeant Eric Krull advised that he was enroute. (*Id.*, para. 12).

Officer Black advised over the radio that they had observed movement at the back side of the store and that the suspects appeared to be trying to flee out the back door. (*Id.*, para. 13). Officer Griffin and Officer Hartman were both on the west side of the front door of Dollar General. (*Id.*, para. 14). Officer Hartman could not see inside Dollar General because the windows were covered. (*Id.*). Officer Hartman indicated to Officer Griffin that they needed to make entry and respond immediately to assist Officer Bieker and Officer Black. (*Id.*).

Officer Hartman was concerned for the safety of the officers, the employees in the store, and the civilians outside the store. (*Id.*, para. 15). The situation was very uncertain, tense, and rapidly evolving. (*Id.*).

As Officer Hartman moved closer to the front door with the intention of entering, the first suspect, later identified as Christopher Johnson, came crashing out the front entrance. (*Id.*, para.

5

16). At first Officer Hartman thought Johnson was a victim who had been held hostage, but then Officer Hartman observed that his face was covered with a zip-up hoodie or jacket. (*Id.*, para. 17). Realizing that he was a suspect, Officer Hartman transitioned to looking at his hands which were empty. (*Id.*).

Officer Hartman began yelling commands for Johnson to stop and get on the ground. (*Id.*, para. 18). Johnson disregarded the commands and took off at a full sprint away from the building. (*Id.*). Almost immediately after Johnson bolted out of the store, the second suspect, later identified as Anthony Gant, began exiting the store. (*Id.*, para. 19).

Officer Hartman observed what he believed to be a handgun in Gant's left hand as he exited the doorway. (*Id.*, para. 20). Officer Hartman began yelling commands to Gant to stop and get down. (*Id.*). Gant did not comply and did not show any indication that he was going to surrender. (*Id.*). Gant was approximately ten to fifteen feet from Officer Hartman. (*Id.*, para. 21). Gant oriented himself toward Officer Hartman and looked at him. (*Id.*).

Given that Officer Hartman had no cover and given the very close proximity between Gant and Officer Hartman, Officer Hartman was fearful for his life. (*Id.*, para. 22). Officer Hartman believed that Gant was going to shoot him. (*Id.*). Officer Hartman discharged two rounds from his firearm, one of which struck Gant in the abdomen. (*Id.*, para. 23). The suspects Johnson and Gant never showed any indication that they were going to surrender despite the numerous police officers' commands to "stop" and to "get on the ground". (*Id.*, para. 24).

The incident was captured on Officer Hartman's in-car camera under Control No. 15F111355. (*Id.*, para. 25). A true and accurate copy of said video recording has been filed with the District Court and marked as defendants' Exhibit D. (*Id.*).

**2.   Officer Bradley Griffin's Sworn Testimony**

Officer Bradley Griffin became a police officer for the City of Fort Wayne on December 15, 1999. (Doc. 37-2; Griffin Aff., para. 2). He became a Sergeant on September 14, 2015. (*Id.*).[1]

Officer Griffin was on duty as a Fort Wayne police officer on August 23, 2015. (*Id.*, para. 3). Officer Griffin was a canine officer. (*Id.*). Officer Griffin was in full police uniform and driving a fully marked police car. (*Id.*).

On August 23, 2015, Officer Griffin responded to an armed robbery in progress at Dollar General located at 3121 East State Boulevard. (*Id.*, para. 4). Prior to August 23, 2015, Officer Griffin was aware that multiple armed robberies had occurred at Dollar Generals throughout Fort Wayne. (*Id.*).

When Officer Griffin arrived at Dollar General, Officer Griffin parked his police vehicle at an angle facing the front door. (*Id.*, para. 5). Officer Griffin got his canine out and went to the west side of the front door of Dollar General. (*Id.*). The windows of Dollar General were blocked and Officer Griffin could not see into the store. (*Id.*, para. 6). Officer Daniel Hartman who was also on the west side of the store's front door stated that he could not see inside the store either. (*Id.*).

Officer Griffin heard over the radio that the suspects had exited the back door of Dollar General. (*Id.*, para. 7). The next thing Officer Griffin heard was Officer Jason Palm, who was at the front of the store on the east side of the front door yelling "Two inside! Two inside!". (*Id.*). All of the sudden, a suspect dressed all in black came sprinting out the front door of Dollar General. (*Id.*, para. 8). The suspect had his face covered. (*Id.*). All three officers yelled at the

---

[1]  As Sergeant Griffin was an officer on the date of the incident, he will be referred to as an officer herein.

suspect to "Get down! Get down!". (*Id.*).

Officer Griffin observed the suspect running across the parking lot. (*Id.*, para. 9). The suspect was later identified as Christopher Johnson. (*Id.*). When the first suspect exited the door, Officer Griffin was concerned for the safety of the officers on the scene, his own safety, and the safety of any civilians outside of the store. (*Id.*, para. 10). Officer Griffin then heard shots fired. (*Id.*, para. 11). Officer Griffin took his canine to the front door and saw a suspect in a seated position inside the vestibule. (*Id.*, para. 12). Officer Griffin ordered him at gunpoint, "Get on the ground! Get on the ground!". (*Id.*). The suspect, later identified as Anthony Gant, told Officer Griffin that he had been shot. (*Id.*). Officer Griffin aired that Gant had been shot and called for an ambulance. (*Id.*, para. 13). Officer Griffin handcuffed Gant on the ground and told him to lie down. (*Id.*). At that point, Officer Griffin did not know if there would be more suspects coming out the door. (*Id.*, para. 14).

The ambulance arrived prior to the scene being cleared. (*Id.*, para. 15). For the safety of the ambulance personnel, the officers told the ambulance personnel that they would have to hold off until the scene was cleared. (*Id.*).

While Officer Brian Juricak covered the suspect by the door, Officer Edward Black and Officer Griffin went into Dollar General to clear the store. (*Id.*, para. 16). Officer Black yelled out that there was somebody on the ground zip tied. (*Id.*). As soon as the scene was cleared the ambulance personnel were able to attend to Gant. (*Id.*, para. 17). Officer Griffin found a pair of gloves lying on the ground near Gant. (*Id.*, para. 18).

The suspects made no attempt to surrender as they exited Dollar General. (*Id.*, para. 19). The situation was tense, uncertain, and rapidly evolving. (*Id.*, para. 20).

The incident was captured on Officer Griffin's in-car camera under Control No.

8

15F111355. (*Id.*, para. 21). A true and accurate copy of said video recording has been filed with the District Court and marked as defendants' Exhibit E. (*Id.*).

### 3. Officer Jason Palm's Sworn Testimony

Officer Jason Palm became a police officer for the City of Fort Wayne on October 12, 1995. (Doc 37-3; Palm Aff., para 2). On August 23, 2015, Officer Palm was on duty as a Fort Wayne police officer. (*Id.*, para. 3). Officer Palm was in full police uniform and driving an unmarked Chevy Impala police car. (*Id.*).

On August 23, 2015, Officer Palm heard a dispatch about an armed robbery in progress at Dollar General at 3121 East State Boulevard. (*Id.*, para. 4). Officer Palm began driving towards Dollar General. (*Id.*, para. 5). Officer Palm heard that someone in the business had called someone else who was now talking to dispatch. (*Id.*). There was something said about a safe or register not opening. (*Id.*).

Officer Palm was aware that numerous Dollar General stores had been robbed in the recent past in Fort Wayne. (*Id.*, para. 6). Officer Palm was aware that weapons had been used and people were zip tied in the prior robberies. (*Id.*).

As Officer Palm reached the Dollar General parking lot, he exited his black unmarked Impala police car. (*Id.*, para. 7). Officer Palm was in full police uniform. (*Id.*). Officer Bradley Griffin and Officer Daniel Hartman were on scene in front of Dollar General on the west side of the front door when Officer Palm arrived. (*Id.*).

Officer Palm took his long gun out of his trunk because he did not know what the suspects were armed with. (*Id.*, para. 8). Officer Palm then positioned himself behind a vehicle on the east side of the front door. (*Id.*).

Officer Palm was concerned for his own safety as well as the safety of the employees

inside the store, other police officers, and civilians outside of the store. (*Id.*, para. 9). Officer Palm was aware that there were police officers in the back behind the store. (*Id.*, para. 10). Officer Palm heard on the air that the suspects tried to exit the back door of Dollar General, but then went back inside the store. (*Id.*).

The front windows of Dollar General were covered up. (*Id.*, para. 11). Officer Palm could not see in the store very well. (*Id.*). Soon after Officer Palm heard dispatch state that the suspects went back inside the store, Officer Palm could see two people on the inside of the store. (*Id.*, para. 12). Officer Palm called out, "Two inside. Two inside." (*Id.*).

All of the sudden the front door of Dollar General burst open. (*Id.*, para. 13). A suspect bolted out the front door at a full sprint. (*Id.*, para. 14). The suspect had on a black sweatshirt with a hoodie that zipped up in the front. (*Id.*). His face was covered with a small opening at the top of his head. (*Id.*). The suspect was later identified as Christopher Johnson. (*Id.*). As soon as Johnson ran out the door, the officers shouted, "Get down! Get down!" and "Get on the ground! Get on the ground!". (*Id.*, para. 15). Officer Palm tracked Johnson as he ran. (*Id.*, para. 16). Officer Palm did not see any weapons in his hands. (*Id.*).

Officer Palm then heard shots fired. (*Id.*, para. 17). Out of his peripheral vision, Officer Palm saw someone fall near the front door. (*Id.*). Officer Palm ran after Johnson. (*Id.*, para. 18). Officer Palm did not see the suspects make any attempt to surrender at all. (*Id.*, para. 19). The situation happened very quickly, was tense, and was rapidly evolving. (*Id.*, para. 20).

**4.   William J. Everett's Sworn Testimony**

William J. Everett is an expert witness in this case and has prepared an Expert Report. (Doc. 37-4; Everett Aff., paras. 2, 3). A true and correct copy of William J. Everett's Expert Report is attached as Exhibit 1 to his Affidavit. (*Id.*). Everett is a member of Force Science

Institute. (*Id.*, Exhibit 2). Everett trains law enforcement officers and police instructors regarding

human behavior in dynamic, high stress situations. (*Id.*). Everett provides instruction regarding

action / reaction dynamics and timeframes, attention, perception, and decision making. (*Id.*).

Everett has a degree in Law Enforcement and a Juris Doctor. (*Id.*).

It is Everett's opinion that:

"A reasonable officer responding to this situation would have believed that there
was a robbery in progress at the Dollar General Store. Based on Officer
Hartman's knowledge of prior robberies at Dollar Generals in Fort Wayne, it
would have been reasonable for him to expect that there would be more than one
suspect, that they would be working as a team, and that they would be armed as
they had been in the past." (Expert Report, p. 10).

It is Everett's opinion that:

"It was reasonable for Hartman to believe Gant was also involved in the robbery,
because Gant had been moving in tandem with Johnson, who was wearing what
appeared to be a mask. Once Johnson cleared the doorway of the store, Gant
moved into the threshold and oriented himself toward Hartman. Hartman saw that
Gant was looking at him. Hartman estimated that there was less than 20 feet
separating himself from Gant. The videos show that Hartman was in the open
with no 'cover' from any gunshots that Gant could fire. Assuming that Gant had a
gun and intended to shoot, a reasonable officer would have understood that Gant
could have raised a gun and fired it before Hartman could respond to stop him."
(Expert Report, p. 10).

It is Everett's opinion that:

"To summarize, it is my opinion that a reasonable officer under these
circumstances could have reasonably concluded that Gant was involved in a
robbery, that he was armed, and that he moved his left arm in the same way that
one would move a gun in the course of pointing it toward Hartman to shoot. A
reasonable officer could have reasonably concluded that Gant presented an
immediate, serious threat." (Expert Report, p. 12).

It is Everett's opinion that:

"Hartman had no cover available and was fully exposed to whatever risk Gant
presented. At the time Gant dropped his hand from the door and moved it toward
the center of his body, a reasonable officer perceiving a threat would understand
that he was already at risk of being fired upon, and that any delay in responding
could result in serious injury or death." (Expert Report, p. 12).

11

It is Everett's opinion that:

"Hartman indicated he fired at Gant after seeing him move his left hand in the
same way as someone would who was pointing a firearm at him. Hartman's
statement and the video evidence are in accord on this point. A reasonable officer
under similar circumstances could have perceived Gant's actions as constituting a
threat of serious injury or death, and would have believed the use of deadly force
was warranted." (Expert Report, pp. 12-13).

**5.  Criminal Conviction**

Anthony Gant pled guilty to Robbery Taking Property by Force or Threatening the Use

of Force While Armed, Indiana Code 35-42-5(1), a Class 3 Felony, arising out of the incident on

August 23, 2015. (Doc 37-6; Certified copy of Plea of Guilty and certified copy of Case

Summary in *State of Indiana v. Anthony Gant*, Case No. 02D04-1509-F3-000056, Ex. H).

<strong>SUMMARY OF THE ARGUMENT</strong>

Based on the undisputed facts, Officer Daniel Hartman did not violate clearly established

law on August 23, 2015. The case relied upon by the District Court to deny qualified immunity,

*White v. Gerardot*, 509 F.3d 829 (7th Cir. 2007), did not put Officer Hartman on notice that he

was violating clearly established law.

A reasonable officer could have concluded that Anthony Gant was involved in an armed

robbery, was armed, and that Gant moved his left arm in the same way that one would move a

gun in the course of pointing it toward Officer Hartman to shoot. Therefore, this Court should

reverse the District Court's order denying Daniel Hartman's summary judgment motion and

enter an order granting summary judgment for Officer Hartman on the basis of qualified

immunity.

12

**ARGUMENT**

**A.**     **Standard of Review**

The Court reviews *de novo* the District Court's denial of summary judgment on the

grounds of qualified immunity. *See Sullivan v. Ramirez*, 360 F.3d 692, 696 (7th Cir. 2004).

Even though pertinent facts may be disputed, the judge always decides the qualified immunity

issue. *Jones v. City of Chicago*, 856 F.2d 935 (7th Cir. 1988); *Rakovich v. Wade*, 850 F.2d 1180

(7th Cir. 1988). The Seventh Circuit holds:

> "While ordinarily a court grants summary judgment only if no reasonable jury
> could find for the non-moving party, a court grants summary judgment based on
> qualified immunity if a reasonable officer could find the defendant's actions
> justified. When reasonable minds could differ, in the typical summary judgment
> decision the balance tips in favor of the nonmovant <u>while in the qualified
> immunity context the balance favors the movant</u>."

*Ellis v. Wynalda*, 999 F.2d 243, 246 fn 2 (7th Cir. 1993) (emphasis added).

When qualified immunity turns on the police officer's actual conduct, "the district court

should consider not only the plaintiff's allegations, but <u>all the undisputed facts in the record</u>

when deciding whether the defendant's conduct violated clearly established legal principles."

*Green v. Carlson*, 826 F.2d 647, 651 (7th Cir. 1987) (emphasis added). In other words, in

determining whether the District Court mistakenly denied qualified immunity, the Appellate

Court can look beyond the factual account of the District Court. Specifically,

> "The appellate court is not required to accept the facts as described by the
> district court, although in most instances it is appropriate to do so. But, in
> cases, such as the present one, where the appellants are not asking the
> court to resolve factual disputes or determine whether the evidence is
> sufficient, <u>it is appropriate for this court to look beyond the factual
> account of the district court to all undisputed evidence</u>."

*Washington v. Haupert*, 481 F.3d 543, 549 fn 2 (7th Cir. 2007) (emphasis added).

In the present case, Officer Hartman is not asking this Court to resolve factual disputes.

Instead, Officer Hartman is asking this Court to consider all of the undisputed evidence in the record. Officer Hartman contends that based on all of the undisputed evidence, Officer Hartman did not violate clearly established law on August 23, 2015, by using deadly force when he feared for his own life. Hence, the District Court's denial of qualified immunity for Officer Hartman should be reversed.

## B.     Qualified Immunity

The defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages if their conduct does not violate clearly established law of which a reasonable official would have known. *Marshall v. Allen*, 984 F.2d 787, 791 (7th Cir. 1993), *reh'g denied*. Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. *Lovett v. Herbert*, __ F.3d __, 2018 WL 5316552 (7th Cir. 2018).

"Determining whether a defendant state officer is entitled to qualified immunity involves two inquiries: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014). The defendant officer is entitled to qualified immunity if *either* inquiry is answered in the negative. *Id.*

The United States Supreme Court holds that if no constitutional right was violated, there is no necessity for further inquiries. *Saucier v. Katz*, 121 S. Ct 2151, 2156 (2001). However, if a violation could be made, the next step is to ask whether the right was clearly established; this inquiry must be undertaken in light of the particular circumstances of the case. *Id*. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation the officer confronted.

14

*Id*. If the law did not place the officer on notice that the conduct would be clearly unlawful,

summary judgment based on qualified immunity is appropriate. *Id*. at 2156-57. The law of

qualified immunity provides that if officers of reasonable competence could disagree on an issue,

immunity should be recognized. *Malley v. Briggs*, 475 U.S. 335 (1986).

In *Kisela v. Hughes*, 138 S. Ct. 1148 (2018), the United States Supreme Court held that a

police officer who shot a woman with a knife did not violate clearly established law. The

Supreme Court stated, "Use of excessive force is an area of the law 'in which the result depends

very much on the facts of each case,' and thus police officers are entitled to qualified immunity

unless existing precedent 'squarely governs' the specific facts at issue." *Id*. at 1153, *citing*

*Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015). The Supreme Court continued:

> "Where constitutional guidelines seem inapplicable or too remote, it does not
> suffice for a court simply to state that an officer may not use unreasonable and
> excessive force, deny qualified immunity, and then remit the case for a trial on the
> question of reasonableness. An officer 'cannot be said to have violated a clearly
> established right unless the right's contours were sufficiently definite that any
> reasonable official in the defendant's shoes would have understood that he was
> violating it.' That is a necessary part of the qualified-immunity standard, and it is
> a part of the standard that the Court of Appeals here failed to implement in a
> correct way." *Id*. at 1153 (citations omitted).

In *Mullenix v. Luna*, *supra,* at 308, the United States Supreme Court stated:

> "We have repeatedly told courts . . . not to define clearly established law at a high
> level of generality. The dispositive question is whether the violative nature of
> *particular* conduct is clearly established. This inquiry must be undertaken in light
> of the specific context of the case, not as a broad general proposition. Such
> specificity is especially important in the Fourth Amendment context, where the
> Court has recognized that it is sometimes difficult for an officer to determine how
> the relevant legal doctrine, here excessive force, will apply to the factual situation
> the officer confronts." (citations omitted).

The United States Supreme Court continued:

> "The relevant inquiry is whether existing precedent placed the conclusion that
> Mullenix acted unreasonably in the circumstances 'beyond debate.' The general
> principle that deadly force requires a sufficient threat hardly settles this matter."

*Id.* at 309 (citations omitted).

In *White v. Pauly*, 137 S. Ct. 548, 552 (2017), the United States Supreme Court stated:

> "Today, it is again necessary to reiterate the long standing principle that 'clearly established law' should not be defined 'at a high level of generality'. As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." (citations omitted).

## C.    The Case Law Relied Upon By The District Court In Denying Qualified Immunity Did Not Put Officer Hartman On Notice That He Was Violating Clearly Established Law.

The District Court relied upon *White v. Gerardot*, 509 F.3d 829 (7th Cir. 2007) to deny qualified immunity. However, *White v. Gerardot* did not put Officer Hartman on notice that he was violating clearly established law as Officer Hartman did not shoot someone who had their hands in the air.

In *White v. Gerardot*, a police officer shot and killed Derrick Ford. The officer believed that Ford had a gun. However, no gun was found. The Estate presented an affidavit of a witness stating that when the officer allegedly yelled "freeze!", Ford turned around with his hands in the air, and the officer shot Ford when his hands were in the air. The witness further stated that when Ford dropped to his knees, the officer shot Ford several more times. There also was a question about whether Ford was even the suspect. The Seventh Circuit dismissed the appeal, stating that the officer's legal arguments claiming qualified immunity were based on disputed facts.

*White v. Gerardot* is not a closely analogous case. There is no evidence in this case that Officer Hartman shot Gant when Gant's hands were in the air. In fact, the video shows that Gant's hands were not in the air. In addition, the undisputed facts show that the officers shouted "Get down! Get down! Get on the ground! Get on the ground!" Despite these commands, the officers did not see either armed robbery suspect make any attempt to surrender. Also, unlike

16

*White v. Gerardot*, there is no question that Officer Hartman shot the armed robbery suspect. *White v. Gerardot* does not "squarely govern" the specific facts at issue as required by the United States Supreme Court to defeat qualified immunity. *See Kisela v. Hughes, supra*, at 1153.

The District Court states in the facts that "Neither Defendant Griffin nor Palm saw anything in the Plaintiff's hands that appeared to be a handgun." However, neither Griffin nor Palm were looking at Gant's hands when Officer Hartman discharged his firearm. Griffin was observing the first suspect Christopher Johnson running across the parking lot when he heard shots fired. (Doc. 37-2; Griffin Aff., paras. 9 and 11). Likewise, Palm was tracking the suspect Christopher Johnson as he ran when Palm heard shots fired. (Doc. 37-3; Palm Aff., paras. 16 and 17). The fact that Griffin and Palm did not see Gant with a gun in his hands is insignificant because they were not even looking at Gant's hands when Hartman discharged his firearm.

The District Court completely ignored William Everett's expert opinions. Everett states that at the time Gant dropped his hand from the door and moved it toward the center of his body, a reasonable officer perceiving a threat would understand that he was already at risk of being fired upon, and that any delay in responding could result in serious injury or death. Everett explains, "Law enforcement officers are trained to understand that action is generally faster than reaction in force and deadly force confrontations. As applied to armed encounters, by the time an officer notices that a suspect is raising a gun to shoot, the officer is already likely out of time to defend himself or herself by firing first." (Doc. 37-4; Everett's Report; Ex. F-1, p. 8). "To react, an officer must first perceive a threat, which will typically result from *processing* the actions of the suspect and then determining the appropriate response. The suspect, however, will by then already have moved in to the shorter response phase (e.g., pulling the trigger), resulting in *action* always being faster than *reaction*." (*Id.*).

17

Everett concludes, "Once an officer notices a suspect beginning to move a gun into a firing position, the officer is behind the reaction curve and faces a substantial risk of being shot before being able to deliver life-saving gunfire toward the assailant. This means that delaying action to seek confirmatory information about a weapon or a suspect's intentions comes at the expense of elongating the immediate risk of being seriously injured or killed. Hartman had no cover available and was fully exposed to whatever risk Gant presented. At the time Gant dropped his hand from the door and moved it toward the center of his body, a reasonable officer perceiving a threat would understand that he was already at risk of being fired upon, and that any delay in responding could result in serious injury or death." (*Id.* at p. 12.). Everett's expert opinions are undisputed.

It is undisputed that Hartman was responding to an armed robbery in progress at Dollar General. (Doc. 37-1; Hartman Aff., para. 4). It is undisputed that prior to August 23, 2015, Hartman was aware of multiple armed robberies that had occurred specifically at Dollar General Stores throughout the City of Fort Wayne. (*Id.*, para. 7). Hartman knew that typically, two men entered the store, displayed hand guns, confined / zip tied employees, waited for registers to open, and departed taking cash, cigarettes, and employees' cell phones. (*Id.*). As Everett explains "There was no reason for him to believe this situation was different." (Doc. 37-4; Everett's Report; Ex. F-1, p. 9).

Furthermore, it is undisputed that Gant was armed at some point during the robbery as he pled guilty to "robbery taking property by force or threatening the use of force while armed." (Doc. 37-6; Ex. H). Gant pled guilty to Robbery, a Level 3 felony, which means the robbery was committed "while armed with a deadly weapon." Indiana Code 35-42-5-1.

As Everett explains, "Based on Officer Hartman's knowledge of prior robberies at Dollar

18

Generals in Fort Wayne, it would have been reasonable for him to expect that there would be more than one suspect, that they would be working as a team, and that they would be armed as they had been in the past." (Doc. 37-4; Everett's Report; Ex. F-1, p. 10). Everett further explains, "It was reasonable for Hartman to believe Gant was also involved in the robbery, because Gant had been moving in tandem with Johnson, who was wearing what appeared to be a mask." (Ex. F-1, p. 10). In Everett's opinion "a reasonable officer under these circumstances could have reasonable concluded that Gant was involved in a robbery, that he was armed, and that he moved his left arm in the same way that one would move a gun in the course of pointing it toward Hartman to shoot." (Ex. F-1, p. 12). Everett states that a reasonable officer "would have believed the use of deadly force was warranted." (Ex. F-1, pp. 12-13).

These undisputed facts are all significant as they are part of the totality of the circumstances. "'The calculus of reasonableness must embody allowance for the fact the police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.' The court weighs what the officer knew, the specific situation he encountered, and events leading up to the decision to use deadly force – in other words, the totality of the circumstances." *Estate of Tony Robinson v. the City of Madison*, 2017 WL 564682 (W.D. Wisc. 2017) *citing Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

Contrary to the District Court's opinion, Officer Harman did not violate clearly established law. *White v. Gerardot* does not defeat Officer Hartman's qualified immunity defense. As such, the District Court's decision should be reversed.

19

**D.      Based On The United States Supreme Court And Seventh Circuit Case Law That Pre-dates August 23, 2015, Officer Hartman Did Not Violate Clearly Established Law.**

The United States Supreme Court holds that deadly force may be used when it is necessary to prevent the escape of a suspect, and the police officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others. *Tennessee v. Garner*, 471 U.S. 1 (1985). In *Tennessee v. Garner*, the United States Supreme Court stated:

> "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape . . . ."  *Id.* at 11-12.

Whether a law enforcement officer acted reasonably in using deadly force under the facts and circumstances of a particular case is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Lester v. City of Chicago*, 830 F.2d 706, 711 (7th Cir. 1987). All decisions about deadly force "must embody allowance for the fact that police officers are often forced to make split second judgments - - in circumstances that are tense, uncertain and rapidly evolving." *Plakas v. Drinski*, 19 F.3d 1143 (7th Cir. 1994), *citing Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

*Ford v. Childers*, 855 F.2d 1271 (7th Cir. 1988) is a Seventh Circuit decision that pre-dates the subject shooting incident of August 23, 2015 and is instructive on using deadly force when an officer believes a suspect is armed. In *Ford*, police officer David Childers responded to a silent hold up alarm at a bank. When Childers arrived at the scene, Childers positioned himself next to a bank window. He looked inside. He saw a masked individual standing with his arm

20

extended towards people in the bank. However, a pillar or wall partially obstructed Childers'

vision. Childers did not know what object, if any, the masked man was holding. Officer Childers

and his partner then stationed themselves behind a parked car near the bank. Childers observed

the suspect run out of the bank. Childers and his partner shot the suspect in the back.

The suspect sued the police officers, alleging that the use of their weapons violated his

Fourth Amendment rights. At the close of the plaintiff's case in chief, the District Court granted

the defendants' motion for a directed verdict.

On appeal, the Seventh Circuit affirmed, holding that Childers' actions were

objectionably reasonable when he shot the suspect. With respect to the fact that Officer Childers

did not actually see a weapon in the suspect's hand, the Seventh Circuit stated:

> "As we recognized in another Section 1983 action concerning a police shooting, a
> reasonable belief that danger exists may be formed by reliance on appearances.
> And as we noted today, no right is guaranteed by federal law that one will be free
> from circumstances where he will be endangered by the misinterpretation of his
> acts. A view of the totality of the information Officer Childers possessed when he
> fired at Ford, we hold that a reasonable jury could only conclude that Officer
> Childers had probable cause to believe that Ford posed a threat of serious physical
> harm to himself and/or to others. Thus, Childers' actions under the circumstances
> were objectively reasonable as a matter of law." *Id.* at 1276-77 (citations omitted)
> (emphasis added).

Another Seventh Circuit decision involving the use of deadly force that pre-dates August

23, 2015, is *Tom v. Voida*, 963 F.2d 952 (7th Cir. 1992). In that case, a police officer shot and

killed a teenager. It all began when a police officer approached an eighteen-year-old who had

fallen off a bicycle. The encounter escalated into a violent physical struggle, an attempted

handcuffing, and a chase. When the decedent lunged at the police officer, she shot and killed the

teenager. The plaintiff sued the police officer and the City of Indianapolis. The plaintiff claimed

that the defendants violated the decedent's Fourth Amendment rights.

The Southern District Court of Indiana granted summary judgment. The Seventh Circuit

21

affirmed, holding that the police officer justifiably believed that the decedent posed an immediate threat to the police officer.

In *Frane v. Kijowski*, 992 F. Supp. 985 (N.D. Ill. 1998), a husband was pointing a pellet gun at his wife, and a police officer shot him. The Northern District Court of Illinois held that the police officer did not use excessive force. The Court explained:

> "The officers had to act quickly and they made a split-second decision to shoot Michael Frane through the window and terminate the threat posed by Frane. The Fourth Amendment does not require officers to wait until a suspect shoots to confirm that a serious threat of harm exists. Neither is the Court persuaded that the fact that Officer Kijowski fired three shots indicates that the force used was excessive. .... It is not the role of the Court to second-guess the officer's judgment, which was made in the heat of the moment, but only to consider the circumstances through the immediate perspective of a reasonable officer on the scene." *Id*. at 992 (citations omitted) (emphasis added).

Based on these Supreme Court and Seventh Circuit decisions, a reasonable officer would not have known that the use of deadly force would violate a suspect's constitutional rights when the officer reasonably believes that the suspect had just committed a robbery, was armed, and the suspect could have raised a gun and fired it before the officer could respond to stop him.[2] In fact, these decisions instruct that Officer Hartman's use of deadly force was reasonable. These decisions instruct that an officer may form a reasonable belief that danger exists by reliance on appearances, and that the Fourth Amendment does not require an officer to wait until a suspect shoots to confirm that a serious threat of harm exists.

---

[2] Indiana Code 35-41-3-3, the Indiana statute governing the use of deadly force, provides:
"(b). . . an officer is justified in using deadly force only if the officer:
    (1)   has probable cause to believe that the deadly force is necessary:
        (A)   to prevent the commission of a forcible felony; or
        (B)   to effect an arrest of a person who the officer has probable cause to believe poses a threat of serious bodily injury to the officer or a third person. . . ."

In addition, case law from other jurisdictions shows that Officer Hartman would not have been put on notice that the use of deadly force under the circumstances would violate Gant's constitutional rights. For example, in *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001), police officer David Russell believed that Major Maurice Anderson had a gun under his sweater at a shopping mall. After Anderson exited the mall, Officer Russell and Officer Pearson approached Anderson with their guns drawn and instructed Anderson to raise his hands. Anderson initially complied and raised his hands. He later lowered them in an attempt to reach into his back left pocket to turn off his Walkman radio. Officer Russell believed that Anderson was reaching for a weapon. Therefore, Officer Russell shot Anderson three times. A search of Anderson revealed that he had a radio, and Anderson was not armed. The jury found that Russell had used excessive force against Anderson. After the return of the jury verdict, Russell renewed his motion for summary judgment. Russell argued that qualified immunity should have been granted as a matter of law. On appeal, the Fourth Circuit held that as a matter of law Russell's use of deadly force did not violate the Fourth Amendment.

In *Anderson*, a witness to the shooting incident, Larry Williams, testified that although Anderson was lowering his hands, he was lowering them slowly. Mr. Williams testified that Anderson's hands "were still around head level when he was shot". With respect to this testimony, the Fourth Circuit stated:

> "In a rapidly evolving scenario such as this one, a witness's account of the event will rarely, if ever, coincide perfectly with the officers' perceptions because the witness is typically viewing the event from a different angle than that of the officer. For that reason, minor discrepancies in testimony do not create a material issue of fact in an excessive force claim, particularly when, as here, the witness views the event from a worse vantage point than that of the officers. . . .Thus, the discrepancies between the officers' testimony and Williams's testimony about the positioning and speed at which Anderson was lowering his hands do not raise an issue of triable fact.

23

....

This Circuit has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action....Accordingly, because Russell had sound reason to believe that Anderson was armed, Russell acted reasonably by firing on Anderson as a protective measure before directly observing a deadly weapon.

....

Russell's split-second decision to use deadly force against Anderson was reasonable in light of Russell's well-founded, though mistaken, belief that Anderson was reaching for a handgun. Thus, Russell's use of force does not constitute a Fourth Amendment violation." *Id*. at 130-132.

*See Ford v. Childers*, *supra* at 1275 (officer's liability must be determined exclusively upon the information known to the officer immediately prior to and at the very moment he fired the fatal shot).

Similarly, in *Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991), four suspects occupied a stopped car. Police Officer Steve Anderson drew his gun. He approached the car. Over the noise from his squad car siren, he repeatedly ordered the suspects to raise their hands. Officer Anderson was ten feet away. Richard Crawford occupied the passenger front seat. Crawford repeatedly raised and lowered his hands.

Crawford then turned slightly to his left, away from Officer Anderson, reaching down toward the floorboard. Officer Anderson believed that Crawford had picked up a gun. Officer Anderson feared he would be shot. Officer Anderson shot Crawford once in the head, killing him. Crawford, in fact, was unarmed.

The Fifth Circuit concluded that even though Crawford was unarmed, Officer Anderson's shooting of Crawford was reasonable and not excessive as a matter of law. The Fifth Circuit explained that Officer Anderson had his gun pointed at Crawford, and over the siren noise, ordered the vehicle's occupants to raise their hands. The Fifth Circuit further explained that

24

Anderson could have reasonably believed that Crawford had retrieved a gun and was about to shoot. The Fifth Circuit held that under these circumstances, a reasonable officer could fear for his safety and others nearby. Significantly, the Fifth Circuit stated:

> "Also irrelevant is the fact that Crawford was actually unarmed. Anderson did not and could not have known this. The sad truth is that Crawford's actions alone could cause a reasonable officer to fear imminent and serious physical harm." *Id.* at 501.

Like *Reese*, Officer Hartman believed Gant had a gun. Like *Reese*, under these circumstances, a reasonable officer could fear for his safety when Gant just committing an armed robbery and could have raised a gun and fired it before Hartman could respond to stop him. Based on the undisputed facts, Officer Hartman did not violate clearly established law.

*Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992), is also instructive. In *Smith*, police officer Schulcz saw a vehicle speeding out of an apartment complex and running a stop sign. Brent Smith drove the speeding vehicle. Officer Schulcz pursued Smith's vehicle. Smith fled Officer Schulcz for approximately 2.6 miles. Smith then pulled into a dead-end residential street. Smith tried to turn his car around on the grass. In an attempt to prevent Smith from escaping, Officer Schulcz placed his car as close to Smith's as possible. Officer Schulcz exited his car and moved around to its rear. Smith backed up. Smith then sped forward and crashed into Officer Schulcz's car. Smith backed up again. Smith drove around the police car and smashed into a fence. When Smith drove past the police car, Officer Schulcz fired one shot. The bullet killed Smith.

Smith's mother sued Officer Schulcz and the City of Springdale. She claimed that these defendants violated her son's Fourth, Eighth, and Fourteenth Amendment rights.

The District Court granted the defendants' summary judgment motion. The Sixth Circuit affirmed, stating:

> "After a dramatic chase, Officer Schulcz appeared to have trapped his man at the

25

end of a dark street. Suddenly, Mr. Smith freed his car and began speeding down the street. In an instant, Officer Schulcz had to decide whether to allow his suspect to escape. He decided to stop him, and no rational jury could say he acted unreasonably. . .". *Id*. at 347.

*See also Scott v. Edinburg*, 346 F.3d 752 (7th Cir. 2003) (police officer's use of deadly force was permissible to protect third parties).

Likewise, in *Blossom v. Yarbrough*, 492 F.3d 963 (10th Cir. 2005), the Tenth Circuit held that the police officer's use of deadly force was reasonable, and thus, the officer was entitled to qualified immunity. In that case, Deputy Yarbrough did not know whether Jeremy Pickup had a weapon. Deputy Yarbrough shot and killed Mr. Pickup from five to seven feet away. In granting summary judgment based on qualified immunity, the Tenth Circuit stated:

> "The fact that Mr. Pickup was unarmed is not outcome determinative. We have previously rejected the argument that only a suspect armed with a deadly weapon poses a physical threat sufficient to justify the use of deadly force." *Id*. at 968.

Like *Blossom*, whether Gant actually had a weapon is not outcome determinative.[3]

Under these circumstances, Officer Hartman's use of deadly force was reasonable and not excessive as a matter of law. Officer Hartman's use of deadly force did not violate a clearly established right of which a reasonable officer would have known.

Officer Hartman's actions complied with the mandate of *Tennessee v. Garner*, *supra*, and Indiana Code 35-41-3-3. Officer Hartman had probable cause to believe that deadly force was necessary to prevent death or serious bodily injury to himself as well as to others. A reasonable

---

[3] All that is relevant is what Officer Hartman reasonably believed. *See Sherrod v. Berry*, 856 F.2d 802, 804-05 (7th Cir. 1988) (The reception of information beyond what the officer had and reasonably believed at the time he fired his revolver is improper, irrelevant, and prejudicial to the determination of whether the officer acted reasonably under the circumstances.) *See also Chandie v. Whelan*, 21 F. Supp. 2d 170, 177 (E.D.N.Y. 1988) ("The reasonableness inquiry depends only upon the officer's knowledge of the circumstances immediately prior to and at the moment he made the split second decision to employ deadly force.")

officer in similar circumstances would believe that the use of deadly force was necessary.

Officer Hartman did not violate clearly established law. As such, Officer Hartman is entitled to qualified immunity. *See Flynn v. Mills*, 361 F. Supp. 2d 866 (S.D. Ind. 2005) (police officers entitled to qualified immunity when they mistakenly shot civilian witness, believing he was armed shooting suspect); *Liebenstein v. Crowe*, 826 F. Supp. 1174 (E.D. Wis. 1992) (police officers who shot and killed man were entitled to qualified immunity on excessive force claim where man posed threat of serious bodily harm).

## CONCLUSION

For the foregoing reasons, Officer Daniel Hartman requests that this Court reverse the District Court's denial of his motion for summary judgment and grant his motion for summary judgment on the basis of qualified immunity.

Respectfully submitted,

**TRIER LAW OFFICE, LLC**

s/Carolyn M. Trier
Carolyn M. Trier, Esq. #15581-02
P.O. Box 5528
Fort Wayne, IN 46895
Telephone:   (260) 485-7000
Fax:   (260) 485-7003
E-mail: carolyntrier@trierlaw.com
ATTORNEY FOR APPELLANT – DEFENDANT
DANIEL HARTMAN

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7) AND CIRCUIT RULE 32(c)

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because it contains 9,032 words, excluding the parts of the brief exempted by Fed. R.

App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)

and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared

in a proportionally spaced typeface using Microsoft Word in 12-point Times New Roman.


Dated: November 13, 2018                s/Carolyn M. Trier
                                        Carolyn M. Trier, Esq. #15581-02
                                        P.O. Box 5528
                                        Fort Wayne, IN 46895
                                        Telephone: (260) 485-7000
                                        Fax: (260) 485-7003
                                        E-mail: carolyntrier@trierlaw.com
                                        ATTORNEY FOR APPELLANT - DEFENDANT
                                        DANIEL HARTMAN

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

Pursuant to Circuit Rule 30(d), the undersigned counsel hereby certifies that the Required Short Appendix to the Appellant's Brief contains all of the materials required by subsection (a) and (b) of Circuit Rule 30.

s/Carolyn M. Trier
Carolyn M. Trier, Esq. #15581-02
P.O. Box 5528
Fort Wayne, IN 46895
Telephone: (260) 485-7000
Fax: (260) 485-7003
E-mail: carolyntrier@trierlaw.com
ATTORNEY FOR APPELLANT - DEFENDANT
DANIEL HARTMAN

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 13, 2018, I electronically filed the foregoing with the

Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the

CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that

service will be accomplished by the CM/ECF system.

    David W. Frank, <u>dfrank@myers-law.com</u>
    Christopher C. Myers & Associates
    809 South Calhoun Street, Suite 400
    Fort Wayne, IN 46802

        <u>s/Carolyn M. Trier</u>
        Carolyn M. Trier, Esq. #15581-02
        P.O. Box 5528
        Fort Wayne, IN 46895
        Telephone: (260) 485-7000
        Fax: (260) 485-7003
        E-mail: <u>carolyntrier@trierlaw.com</u>
        ATTORNEY FOR APPELLANT - DEFENDANT
        DANIEL HARTMAN

NO. 18-1287

_____

**UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

_____

| | |
|---|---|
| ANTHONY GANT, | ) |
| | ) |
|       Appellee/plaintiff below, | ) |
| | ) |
| v. | ) |
| | ) |
| DANIEL HARTMAN, | ) |
| | ) |
|       Appellant/defendant below. | ) |

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division
Case No. 1:16-cv-380
The Honorable Chief Judge Theresa L. Springmann

APPELLANT DANIEL HARTMAN'S SHORT APPENDIX

**TRIER LAW OFFICE, LLC**
Carolyn M. Trier, Esq. #15581-02
P.O. Box 5528
Fort Wayne, IN 46895
Telephone: (260) 485-7000
Fax: (260) 485-7003
E-mail: carolyntrier@trierlaw.com
ATTORNEY FOR APPELLANT/DEFENDANT

## INDEX TO SHORT APPENDIX

**Page**

Chief Judge Theresa L. Springmann's Opinion and Order..........................................................33

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| ANTHONY GANT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:16-CV-380-TLS |
| | ) | |
| CITY OF FORT WAYNE, | ) | |
| OFFICER DANIEL HARTMAN, | ) | |
| OFFICER JASON PALM, and | ) | |
| OFFICER BRADLEY GRIFFIN, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

This matter comes before the Court on a Motion for Summary Judgment [ECF No. 37]

filed by Defendants Officer Daniel Hartman, Officer Jason Palm, Officer Bradley Griffin, and

the City of Fort Wayne ("the Defendants"). The Plaintiff, Anthony Gant, filed his First Amended

Complaint against the Defendants on March 13, 2017 [ECF No. 27], brought pursuant to 42

U.S.C. § 1983, alleging (1) the unconstitutional use of excessive force in violation of the Fourth

Amendment against Defendant Hartman, (2) failure to intervene against Defendants Griffin and

Palm, (3) failure to adequately train against the City of Fort Wayne, and (4) the unreasonable

denial of emergency medical care in violation of the Fourth and/or Fourteenth Amendments

against Defendant Griffin. In his prayer for relief, the Plaintiff included a request for punitive

damages. On October 25, 2017, the Defendants filed a Motion for Summary Judgment [ECF No.

37] on all counts and assert a claim of qualified immunity as to Defendants Hartman, Griffin, and

Palm. The Defendants also argue that the Plaintiff's request for punitive damages must fail as a

matter of law. The Plaintiff responded on November 11, 2017 [ECF No. 41], and the Defendants

replied on November 22, 2017 [ECF No. 42]. This matter is now fully briefed and ripe for review.

## FACTUAL BACKGROUND

On August 23, 2015, Defendants Hartman and Griffin responded to a call regarding an armed robbery at a Dollar General store. Other police officers soon arrived at the scene, including Defendant Palm. Previously, there had been multiple armed robberies at various Dollar General stores in the City of Fort Wayne, which were carried out in similar fashion. Typically, two men would enter the store, display hand guns, confine/zip tie employees, wait for registers to open, and depart, taking cash, cigarettes, and employees' cell phones.

As Defendant Hartman approached the front door of the Dollar General on August 23, 2015, the first suspect, later identified as Christopher Johnson, ran out the front entrance. After determining that the person was a suspect and not a victim, Defendant Hartman commanded Johnson to stop and get on the ground, but Johnson ignored him and kept running. Soon after, the second suspect, later identified as Anthony Gant, exited the store through the front entrance. Defendant Hartman also commanded Gant to stop and get down on the ground. Defendant Hartman stated that he was fearful for his life because there was no cover available to him and believed that Gant was holding a handgun. Defendant Hartman discharged two rounds from his firearm, one of which struck Gant in the abdomen. It was later determined that Gant was not holding a handgun.

Defendants Griffin and Palm testified that, while observing Johnson running across the parking lot despite being commanded to stop and while concerned for their safety and the safety of others, they heard shots fired. Defendant Palm began to pursue Johnson. Defendant Griffin

took the canine that was with him to the front door of the store and observed the Plaintiff in a seated position inside the vestibule. Defendant Griffin ordered the Plaintiff to get on the ground at which point the Plaintiff informed Defendant Griffin that he had been shot. Defendant Griffin called for an ambulance, handcuffed the Plaintiff, and told him to lie down.

An ambulance arrived about two minutes later. However, Defendant Griffin did not allow ambulance personnel to approach the Plaintiff until the scene had been cleared, which occurred about four minutes later. A total of six minutes elapsed between the time at which Defendant Griffin called the ambulance and the time at which emergency medical personnel were able to administer aide.

Defendant Hartman stated that when he shot the Plaintiff, he believed that the Plaintiff had a handgun in his left hand, and when the Plaintiff turned towards Defendant Hartman and began moving his hand toward the center of his body, Defendant Hartman feared for his life. Neither Defendant Griffin nor Palm saw anything in the Plaintiff's hands that appeared to be a handgun. Defendant Hartman states that the Plaintiff showed no signs of following the command to get on the ground, but the Plaintiff argues that he was given no chance to obey because he was shot almost immediately after exiting the store.

The incident was captured by Defendants Hartman and Griffin's in-car cameras.

**STANDARD OF REVIEW**

Summary judgment is proper where the evidence of record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial burden of informing the Court of the basis for its motion and identifying those portions of the record it

3

believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-movant to "go beyond the pleadings" to cite evidence of a genuine factual dispute that precludes summary judgment. *Id.* at 324. "[A] court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in its favor on a material issue, then the Court must enter summary judgment against it. *Id.*

## ANALYSIS

### A.   Excessive Force

Claims of excessive force in the course of an arrest, investigatory stop, or other "seizure" are to be analyzed under the reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989). "[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). "The reasonableness inquiry is an objective one. The question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

### 1.   *Whether Defendant Hartman's Use of Deadly Force was Excessive*

To determine whether the amount of force used was excessive, the Court "looks to whether the force used to seize the suspect was excessive in relation to the danger he posed—to the community or to the arresting officers if left unattended." *Jacobs v. City of Chi.*, 215 F.3d

758, 773 (7th Cir. 2000). All decisions about the reasonableness of the use of deadly force "must embody allowance for the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain and rapidly evolving." *Plakas v. Drinski*, 19 F.3d 1143 (7th Cir. 1994) (citing *Graham*, 490 U.S. at 396–97). Courts must examine the reasonableness of the actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

"When an officer believes that a suspect's actions place[] him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988). The officer does not necessarily need to be certain that the suspect was armed before using deadly force. *See Garner*, 471 U.S. at 11–12. However, an officer's subjective beliefs regarding the reasonableness of the force applied is not relevant to the inquiry. *Common v. City of Chi.*, 661 F.3d 940, 943 (7th Cir. 2011). "[A] person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force." *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2014).

Here, at the time the Plaintiff was shot, he did not in fact have a gun in his hands. A jury must assess whether it was reasonable for an officer in Defendant Hartman's position to believe that the Plaintiff had a gun. Viewing the facts most favorably to the Plaintiff, a reasonable juror could conclude either that the Plaintiff was in the process of obeying Defendant Hartman's commands or that he did not have the opportunity to obey Defendant Hartman's commands. Therefore, there are genuine issues of material fact as to whether Defendant Harman's use of deadly force was excessive.

5

**2.**      ***Whether Defendant Hartman is Entitled to Qualified Immunity***

Regardless of whether his use of deadly force was reasonable, Defendant Hartman argues that he is entitled to qualified immunity. "The defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Marshall v. Allen*, 984 F.2d 787, 791 (7th Cir. 1993) (internal quotation omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The matter of qualified immunity is for the court, not the jury, to decide. *Jones v. City of Chi.*, 856 F.2d 985 (7th Cir. 1988); *Rackovich v. Wade*, 850 F.2d 1180 (7th Cir. 1988).

Issues on summary judgment regarding qualified immunity require a two-pronged inquiry. "The first asks whether the facts, taken in the light most favorable to the party asserting the injury show the officer's conduct violated a federal right." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014) (internal quotations and alteration omitted). The second asks "whether the right in question was 'clearly established' at the time of the violation." *Id.* at 1866. Courts may decide these two prongs in any order, "[b]ut under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* The Court has already determined that there are genuine issues of material fact regarding the first prong.

Under the second prong, "the salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Id.* (internal quotations and alteration omitted). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). It is a "long standing

6

principle that 'clearly established law' should not be defined 'at a high level of generality.'"
*White v. Pauly*, 137 S. Ct. 548, 552 (2017). Thus, "[t]he general principle that deadly force
requires a sufficient threat hardly settles [the] matter," as it is the particular conduct based on the
circumstances of the case that must have been clearly established as constitutionally
impermissible. *Mullenix*, 136 S. Ct. at 309. Knowledge of basic constitutional rights "imposes
neither an unfair burden upon a person assuming a responsible public office requiring a high
degree of intelligence and judgment for the proper fulfillment of its duties, nor an unwarranted
burden in light of the value which civil rights have in our legal system." *Wood v. Strickland*, 420
U.S. 308, 322 (1975).

 "The Seventh Circuit has recognized . . . that the excessive force standard is well settled
and, since it is already an objective standard based on a reasonable police officer, qualified
immunity normally will not apply." *Johnson v. City of Milwaukee*, 41 F. Supp. 2d 917, 930 (E.D.
Wis. 1999) (citing *Lanigan v. Village of E. Hazel Crest, Ill.*, 110 F.3d 467, 467–67 (7th Cir.
1997)). "Establishing that the use of force in a particular case was 'so plainly excessive' requires
a fair amount of factual development." *Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008).
And, "[i]f a jury finds that any of the Defendants [sic] officers are liable for excessive force, then
by definition they would not be entitled to qualified immunity." *Sheehan v. Noble Cty. Sheriff's
Dept.*, No. 1:14-CV-324, 2016 WL 7100555, at *13 (N.D. Ind. Dec. 6, 2016). Thus, "if the facts
draw into question the objective reasonableness of the police action under the alleged
circumstances, they must be developed in the district court before a definitive ruling on the
defense can be made." *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996). *Ellis v. Wynalda*, 999
F.2d 243, 246 (7th Cir. 1993) (citing *Graham*, 490 U.S. at 396 and *Tennessee v. Garner*, 471
U.S. 1, 11 (1985)) (reversing grant of summary judgment as to qualified immunity where

reasonable jury could find force excessive). That is, where there is a question of fact regarding whether the use of deadly force is justified, a defendant is not entitled to summary judgment on the issue of qualified immunity. Where there are factual disputes regarding the relationship between the force used and the threatened harm, "a trial [is] required before determining whether the officer should have known in the circumstances presented that the [force] was plainly excessive." *Chelios*, 520 F.3d at 692 (internal quotations omitted).

In *White v. Gerardot*, the Seventh Circuit found that questions of fact precluded a finding of qualified immunity under similar circumstances. In *White*, the defendant claimed he was in fear for his life because he believed that the suspect had a gun and that, despite his commands for the suspect to raise his hands, the suspect "was moving his hands in front of him as if he were reloading his gun." 509 F.3d 829, 834 (7th Cir. 2007). However, the plaintiff's characterization of the event conflicted with the defendant's. The plaintiff produced evidence tending to show that the suspect was not, in fact, disobeying the defendant's commands and that the suspect did not, in fact, have a gun in his hands when the defendant shot him. *Id.* at 835. Thus, the Seventh Circuit found it had no jurisdiction to review the district court's denial of summary judgment on qualified immunity because of these issues of disputed material fact. *Id.* In the instant case, it was determined that, at the time Defendant Hartman shot the Plaintiff, the Plaintiff did not in fact have a gun in his hands, and a reasonable juror could conclude that he was in the process of obeying Defendant Hartman's commands. Therefore, the Court cannot grant summary judgment as to qualified immunity regarding the Plaintiff's claim for excessive force against Defendant Hartman.

**B.**     **Denial of Medical Care**

Defendant Griffin also argues that he is entitled to qualified immunity on the claim that

he unreasonably denied medical care to the Plaintiff because there is no clearly established law

that his actions, under the circumstances, violated the Plaintiff's rights. It is "well settled that

providing no medical care in the face of a serious health risk constitutes deliberate indifference,"

which exceeds the reasonableness standard of the Fourth Amendment. *Ortiz v. City of Chi.*, 656

F.3d 523, 538 (7th Cir. 2011) (finding that if the defendants were award of the serious medical

condition but failed to take steps to address the condition, the issue of qualified immunity

survived summary judgment).

However, the Plaintiff has not pointed to, and the Court has not found, case law clearly

establishing that briefly delaying medical care by emergency personnel while securing a crime

scene violates a person's Fourth Amendment rights. The Plaintiff cites to *Ross v. United States*

for the proposition that preventing others from reaching the Plaintiff in order to rescue him is

unconstitutional. But *Ross* is distinguishable. In *Ross*, the deputy halted an imminent rescue of a

boy who had fallen into a lake, going so far as to threaten the would-be rescuers with arrest if

they attempted a rescue, because of a policy that permitted only divers from the city fire

department to attempt such rescues. 910 F.2d 1422, 1424–25. It took twenty minutes for the city

fire department's divers to reach the scene and another ten minutes for the divers to retrieve the

boy's body. *Id.* at 25. Although the Seventh Circuit in *Ross* determined that it was "clearly

established on [the relevant date] that a citizen in peril for his life had a constitutional right that

prevented a police officer from cutting off private avenues of lifesaving rescue without providing

an alternative," the situation in the instant case is not so clear. Here, Defendant Griffin did not

delay rescue by a private actor in favor of a public actor not immediately able to provide

9

emergency care. In fact, upon determining that the Plaintiff was injured, Defendant Griffin called

an ambulance. Defendant Griffin was faced with a crime scene, and it had not yet been

determined whether there were remaining, armed suspects that presented a threat to all parties

involved. Thus, even if the jury were to find that Defendant Griffin's actions were objectively

unreasonable, the Court cannot say that the Plaintiff's constitutional rights under the

circumstances were so "clearly established" that a reasonable police officer would have known

that such actions would violate the Plaintiff's constitutional rights. Therefore, the Court will

grant summary judgment of qualified immunity as to the Plaintiff's claim for denial of medical

care against Defendant Griffin.


## C.       Failure to Intervene

The Plaintiff accuses both Defendants Griffin and Palm of failing to intervene in

Defendant Hartman's unconstitutional use of excessive force. A police officer may be liable for a

claim brought pursuant to 42 U.S.C. § 1983 where he fails to intervene to prevent an

unconstitutional wrong, including excessive force, given a reasonable opportunity to do so. *Yang*

*v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Officers "who have a realistic opportunity to step

forward and prevent a fellow officer from violating a plaintiff's rights through the use of

excessive force but fail to do so," therefore, can be held liable. *Miller v. Smith*, 220 F.3d 491,

495 (7th Cir. 2005). The Seventh Circuit "has implied that a 'realistic opportunity to intervene'

may exist whenever an officer could have called for a backup, called for help, or at least

cautioned the excessive force defendant to stop." *Id.* (internal quotation marks and brackets

omitted). "Whether an officer had sufficient time to intervene or was capable of preventing the

harm caused by the other officer is generally an issue for the trier of fact unless, considering all

the evidence, a reasonable jury could not possibly conclude otherwise." *Lanigan v. Village of E. Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997).

The Court has already determined that there is a question of fact as to whether a constitutional violation occurred when Defendant Hartman shot the Plaintiff. There is no question that Defendants Griffin and Palm were present when the incident occurred. Thus, the only remaining question is whether Defendants Griffin and Palm had a realistic opportunity to intervene. "In deciding whether an officer had a realistic opportunity to intervene, courts may consider, among other factors, the length of the excessive force, the number of blows involved, and the positions of the bystander officers relative to the altercation." *Howard v. Ealing*, 876 F. Supp. 2d 1056, 1072 (N.D. Ind. 2012) (citations omitted). Thus, where the "excessive force consists of only one or two blows in quick succession" or where the incident "took only seconds," an officer may not have had a realistic opportunity to intervene. *See id.* at 1072–73.

The Plaintiff contends that Defendants Griffin and Palm knew that he was unarmed and failed to apprise Defendant Hartman of that fact, which would have prevented Defendant Hartman from shooting the Plaintiff. The Plaintiff argues that Defendants Griffin and Palm conceded that they did not see the Plaintiff with a firearm but did not attempt to stop Defendant Hartman from firing on the Plaintiff. Moreover, the Plaintiff points out that the three officers had their guns drawn, waiting for the suspects to exit the store and argues that a "reasonable officer would have been aware that the use of deadly force was possible and he should take all steps to prevent this force where not warranted." (Pl. Resp. Br. 15.)

The Court concludes that no reasonable juror could find that Defendants Griffin and Palm had a realistic opportunity to intervene to prevent Defendant Hartman from firing at the Plaintiff. Both Defendants were tracking the fleeing suspect rather than focusing on the Plaintiff. *See*

11

*Thomas v. City of Fort Wayne*, No. 1:06-CV-320, 2008 WL 282348, at *8 (N.D. Ind. Jan. 31, 2008) (finding no failure to intervene when officers' attention was on restraining the plaintiff rather than on the officer accused of using excessive force); *Gutierrez v. City of Indianapolis*, 886 F. Supp. 2d 984, 998 (S.D. Ind. 2012) (same). Thus, it is of no surprise that neither officer saw the Plaintiff with a firearm or warned Defendant Hartman that the Plaintiff was unarmed.

Moreover, "[t]here is no evidence to suggest anything but that this was a sudden and unexpected quick incident with no signs of what was going to happen until it actually occurred." *Flores v. City of E. Chi.*, No. 2:15-CV-22, 2017 WL 25414, at *5 (N.D. Ind. Jan. 3, 2017). Just over two seconds passed from the time the first suspect began opening the front door of the store—not from the time the Plaintiff was fully visible to the Defendants—until Defendant Hartman fired on the Plaintiff. Even had Defendants Griffin and Palm had their eyes trained on the Plaintiff rather than the fleeing suspect, there was no realistic opportunity for them to intervene. *See Xie v. City of Chi.*, No.14-CV-6082, 2016 WL 6193981, at *4 (N.D. Ill. Oct. 24, 2016) (finding that it would be "patently unreasonable" to find that the defendants had a realistic opportunity to intervene when they had "only a few seconds to appreciate what was happening, let alone prevent the other officers from" acting); *Gilbert v. French*, No. H-06-3986, 2008 WL 394222, at *8 (S.D. Tex. Feb. 12, 2008) (finding as a matter of law that where "mere seconds elapsed from the time [the plaintiff] exited the restaurant until the time he was shot[,]" there was "an insufficient amount of time for officers to appreciate and react to a possible use of excessive force, especially in light of the dangerous and quickly evolving situation"); *Rohrbough v. Hall*, No. 4:07CV996, 2008 WL 4722742, at *5 (E.D. Mo. Oct. 23, 2008) (finding that "[w]here an attack only lasts a few seconds, non-participating bystander officers do not have a 'realistic opportunity to prevent the attack'") (citing *Gaudreault v. Municipality of Salem*, 923 F.2d 303,

(1st Cir. 1990)). Therefore, the Court will grant summary judgment as to the Plaintiff's claim for failure to intervene against Defendants Griffin and Palm.

**D.      Failure to Train**

The City of Fort Wayne argues that the Plaintiff's claim for failure to appropriately train Defendants Hartman, Griffin, and Palm must fail as a matter of law. To establish liability on this theory, the Plaintiff must prove that (1) the Plaintiff suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the City; which (3) was the proximate cause of the Plaintiff's injury. *Ienco v. City of Chi.*, 286 F.3d 994, 998 (7th Cir. 2002) (citing *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690–91 (7th Cir. 1997)). It is only when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact that a municipality may be held liable for the violation of an individual's constitutional rights on a failure to train theory. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Proof of deliberate indifference requires more than "[a] showing of simple or even heightened negligence." *Bd. of Cty. Comm'rs of Bryan Ct. v. Brown*, 520 U.S. 397, 407 (1997). A municipality acts with deliberate indifference in one of two ways: (1) when, "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that the deficiency amounts to deliberate indifference on the part of municipal policymakers, or (2), when a repeated pattern of constitutional violations makes "the need for further training . . . plainly obvious to the city policymakers." *Harris*, 489 U.S. at 390, n.10. "In limited circumstances, a local government's decision not to train certain employees about their legal

duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

A city cannot "be held liable on a failure to train theory or on a municipal policy theory absent a finding that the individual police officers are liable on the underlying substantive claim." *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997). The Supreme Court has "left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." *See id.* at 63. Therefore, a plaintiff may be able to show that "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* However, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributable to a municipal policymaker." *Tapia v. City of Greenwood*, 965 F.2d 336, 338 (7th Cir. 1992) (quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985)).

The Court has already determined that there are questions of fact as to whether a constitutional violation occurred. Thus the Court must now decide whether there was an express municipal policy or common practice or deliberate indifference that was the proximate cause of the Plaintiff's injury.

It is the Plaintiff's burden to come forward with evidence in support of his claim that the City of Fort Wayne failed to adequately train its police officers. However, the only evidence the Plaintiff has of record is, assuming the jury so finds, a single unconstitutional act. The Plaintiff also argues that the Defendants' assertions that no city policies were violated and that Defendant Hartman at all times acted in accordance with his training establishes that an unconstitutional

14

policy existed. However, that no city policies were violated does not establish that there was an existing unconstitutional policy pursuant to which Defendant Hartman acted. And, "merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible" is insufficient. *Harris*, 489 U.S. at 389. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390–91. "[P]lainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *Id.* at 391. Therefore, the Court will grant summary judgment as to the Plaintiff's failure to train claim against the City of Fort Wayne.

**F.       Punitive Damages**

The Plaintiff initially requested that the Court assess punitive damages against Defendants Hartman, Griffin, and Palm. Punitive damages may be assessed only "when the defendant's conduct is shown to be motivated by evil intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Merritt v. De Los Santos*, 721 F.2d 598, 601 (7th Cir. 1983) (citing *Smith v. Wade*, 461 U.S. 30 (1983)). The Seventh Circuit "has required a showing of aggravating circumstances or malicious intent to justify the award of punitive damages." *Id.* (internal quotation omitted). The Defendants argued in their opening brief that the Plaintiff's claim for punitive damages was barred as a matter of law. The Plaintiff produced no evidence, nor even suggested, that Defendant Hartman was motivated by evil intent or that his actions were in reckless or callous indifference to the federally protected rights of

15

others. In fact, the Plaintiff has not responded to the Defendants' argument at all. Thus, the Court will grant summary judgment that the Plaintiff is not entitled to punitive damages.

## CONCLUSION

For these reasons, the Court GRANTS IN PART and DENIES IN PART the Defendants' Motion [ECF No. 37]. The Court grants summary judgment as to the Plaintiff's claims for failure to train, the assessment of punitive damages, qualified immunity as to Defendant Griffin for unreasonable denial of medical care, and failure to intervene as to Defendants Griffin and Palm. The Court denies summary judgment as to Defendant Hartman's qualified immunity and use of excessive force. Because the Court has granted summary judgment in their favor, Defendants Griffin, Palm, and the City of Fort Wayne are DISMISSED from this case. A telephonic scheduling conference will be set by separate order.

SO ORDERED on February 2, 2018.

          s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT

16